Filed 5/12/21  P. v. Griffin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAURICE LAMAR GRIFFIN,<br><br>    Defendant and Appellant. | D077006<br><br><br>(Super. Ct. No. SCD281192) |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon B. Majors-Lewis, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

# INTRODUCTION

A jury found Maurice Lamar Griffin guilty of one count of burglary (count 1; § 459)[1] and found true the special allegation that the burglary was of an inhabited dwelling house (§ 460, subd. (a)).  The jury also found Griffin guilty of one count of petty theft (§ 484), a lesser included offense of the charged offense of grand theft of personal property (count 2).  Following the jury's return of its verdicts, the trial court found true allegations that Griffin suffered a prior conviction that was a strike (§§ 667, subds. (b)–(i), 1170.12, & 668) and a serious felony (§ 667, subd. (a)), and that he was out on bail at the time of the current offenses (§ 12022.1, subd. (b)).

The trial court sentenced Griffin to a total of ten years in prison, consisting of the middle term of four years for the burglary conviction, doubled due to the strike prior, and a consecutive two years for the on-bail enhancement.  The court imposed a concurrent term of 365 days in the custody of the sheriff on count 2.[2]

On appeal, Griffin claims that there is insufficient evidence in the record to support the jury's true finding that the burglary he committed was of an inhabited dwelling house (§ 460, subd. (a)).  Griffin also claims that the trial court abused its discretion in declining to dismiss his strike prior and in sentencing him to the middle term on the burglary count.

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2]    At sentencing, the People conceded that the prior conviction had been reduced to a misdemeanor and could not serve as the basis of a serious felony enhancement.  (See *People v. Park* (2013) 56 Cal.4th 782, 795.)  However, the conviction remained a strike for purposes of the Three Strikes law.  (See §§ 667, subd. (d)(1), 1170.12; *Park, supra*, at p. 794.)

We affirm the judgment.

## II.

## FACTUAL BACKGROUND

Griffin drove his car into the garage of St. Paul's Villa (St. Paul's), a senior living facility that houses approximately 140 residents. A gate to the garage was normally kept shut. However, on the day of the offenses, the gate was open because a resident was moving into the residence.

The garage was on the ground floor of the building. Residences were located on the two floors above the garage; the residences and the garage shared the same walls.

According to the facilities operations manager for St. Paul's Senior Services, "some employees" and "a few" residents parked their vehicles in the garage. Furniture was also stored in the garage and residents occasionally left items, such as walkers and wheelchairs, in the garage when moving out.

On the day of the offenses, Griffin entered the garage, drove to the end of the garage, backed up, and parked next to a maintenance room located inside the garage.[3] The door to the maintenance room was open, and a light was on inside. Jesus F. (Jesus), a maintenance technician, had recently stepped away from the room, leaving behind tools. The room contained a mix of tools, some owned by St. Paul's and some owned by employees, including Jesus.

After parking his car in the garage, Griffin got out the car, leaving the driver's door open. Griffin then entered the maintenance room and came out. He proceeded to walk around the parking garage, return to his vehicle, open the rear passenger door, and walk back into the maintenance room. After

---

[3] We base our description of Griffin's acts on a police officer's testimony summarizing a surveillance video that was shown to the jury.

3

several minutes, Griffin came out with two bags of tools and put the bags on the back seat of his car. Griffin then drove away, taking the tools.

III.

DISCUSSION

A. *There is sufficient evidence in the record to support the jury's true finding that Griffin committed a burglary of an inhabited dwelling house (§ 460, subd. (a))*

Griffin claims that there is insufficient evidence in the record to support the jury's true finding that he committed a burglary of an inhabited dwelling house (§ 460, subd. (a)). Specifically, Griffin contends that the garage at St. Paul's cannot be considered an inhabited dwelling house.

1. *Governing law*

a. *The law governing review of sufficiency claims*

Griffin's argument is premised in part on undisputed evidence, i.e., evidence pertaining to the structure of the senior living facility and evidence pertaining to Griffin's acts during the offense. To the extent that Griffin's claim is premised on such undisputed evidence, we review Griffin's argument as to the legal sufficiency of that evidence to sustain the jury's true finding de novo. (See *People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3 ["The legal sufficiency of undisputed evidence to support a conviction is a question of law which we review de novo"].)

Griffin also argues that "there was no substantial evidence regarding the residents' use of the garage." In evaluating this contention, we apply the ordinary substantial evidence standard of review. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most

4

favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### b. *Substantive law*

#### i. *Statutory law*

Section 459 provides in relevant part:

> "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."

Section 460, subdivision (a) provides in relevant part:

> "Every burglary of an inhabited dwelling house . . . is burglary of the first degree."

#### ii. *Case law*

"A conviction for first degree burglary . . . requires 'entry' of an 'inhabited dwelling house' with the intent to commit a felony. (§§ 459, 460.)" (*People v. Thorn* (2009) 176 Cal.App.4th 255, 261 (*Thorn*).) " '[T]he term "inhabited dwelling house" means a "structure where people ordinarily live and which is currently being used for dwelling purposes. [Citation.] A place is an inhabited dwelling if a person with possessory rights uses the place as sleeping quarters intending to continue doing so in the future." (Citations.)' [Citation.] Courts have broadly interpreted the term 'inhabited dwelling house' to include a variety of structures and places . . . in order to effect the legislative purpose of the burglary statutes—'to protect the peaceful occupation of one's residence' against intrusion and violence." (*Ibid.*)

"In determining whether the defendant has burglarized an inhabited dwelling house, '[t]he question is not whether the specific area is used for

5

sleeping or everyday living, but whether the area is functionally interconnected to and immediately contiguous to the residence, which is used for sleeping or everyday living.' (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1110.) ' " ' "Functionally interconnected" means used in related or complementary ways. "Contiguous" means adjacent, adjoining, nearby or close.' " ' " (*In re M.A.* (2012) 209 Cal.App.4th 317, 323–324.)

"[C]ourts have concluded in several cases that garage- or carport-type structures not normally considered part of the living space are nevertheless functionally connected to the dwelling for purposes of the burglary statutes. (See, e.g., *In re Edwardo V.* (1999) 70 Cal.App.4th 591, 594–595 [attached garage at rear of duplex shared by tenants, not accessible from either duplex and entered only through an exterior door, was functionally interconnected to duplex]; *People v. Ingram* (1995) 40 Cal.App.4th 1397, 1402, 1404, overruled on other grounds in *People v. Dotson* (1997) 16 Cal.4th 547, 560 [garage was functionally connected to residence where it was used for storing garden tools and equipment, and shared roof with residence but was not directly connected to it]; *People v. Zelaya* (1987) 194 Cal.App.3d 73, 75–76 [storage rooms in basement area under apartment house were functionally connected to the building's living quarters].)" (*Thorn, supra*, 176 Cal.App.4th at p. 262.)

2. *Application*

The People presented substantial evidence from which the jury could have found that Griffin entered St. Paul's garage with the intent to steal. Specifically, the People presented evidence that Griffin parked his car in the garage, got out of the car, opened a door of the car, took items from a maintenance room located in the garage, and placed them inside his parked car. (See pt. II, *ante*.) From this evidence, the jury could have found that Griffin entered the garage with the intent to steal. Griffin does not argue to the contrary.

6

Instead, Griffin argues that the garage is not part of an inhabited dwelling house. In considering whether the garage is " 'functionally interconnected to and immediately contiguous to the residence,' " (*In re M.A., supra*, 209 Cal.App.4th at pp. 323–324),[4] we observe that Griffin concedes that the garage is " 'under the same roof' and immediately contiguous to the memory care floor where senior care residents lived." Thus, the garage satisfies the "immediately contiguous," component of the test for determining whether a structure is part of an inhabited dwelling house set out in *In re M.A., supra*, at pages 323–324.[5]

Griffin appears to argue, however, that the garage is not "functionally interconnected" (*In re M.A., supra*, 209 Cal.App.4th at pp. 323–324) to the residential portion of St. Paul's. In an apparent attempt to distinguish the numerous cases in which courts have concluded that garages *are* considered to be part of an inhabited dwelling house for purposes of the burglary statutes (see *Thorn, supra*, 176 Cal.App.4th at p. 262 [citing case law]), Griffin contends that "there was no substantial evidence regarding the residents' use of the garage." We disagree.

---

[4] It is clear that a senior living facility that houses 140 residents, such as St. Paul's, constitutes an inhabited dwelling house. (*Thorn, supra*, 176 Cal.App.4th at p. 261 [defining inhabited dwelling house as " ' "structure where people ordinarily live and which is currently being used for dwelling purposes" ' "].) Griffin presents no argument to the contrary.

[5] Griffin states that "it is worth noting that none of the residents' living quarters were directly accessible from either the maintenance room or the garage." Case law is clear that direct access from the house to the garage is not required in order for a garage to be considered part of an inhabited dwelling house. (See, e.g., *In re Edwardo V., supra*, 70 Cal.App.4th at pp. 594–595.)

7

The facilities operations manager testified that a "few residents who are independent living park their vehicles" in their garage. In addition, while Griffin argues that there was "no evidence any of the residents kept any personal property inside of the garage that would be at risk in a burglary," the vehicles of the residents who were parked in the garage constitute such property. In addition, the facilities operations manager testified that furniture is occasionally stored in the garage[6] and that other personal property is occasionally left in the garage, including walkers and wheelchairs, when a resident moves out of the facility. Thus, even assuming that evidence of *residents'* use of the garage is required to demonstrate functional interconnectedness,[7] the People presented substantial evidence of such use. In short, like the garages at issue discussed in the case law cited in *Thorn*, St. Paul's garage is "functionally connected" to an inhabited dwelling house.

Griffin cites no case law that would support a contrary determination. In the case on which Griffin relies most heavily, *People v. Woods* (1998) 65 Cal.App.4th 345 (*Woods*), the Court of Appeal concluded that a laundry facility within an apartment complex *was* part of an inhabited dwelling house in affirming the defendant's first-degree burglary conviction. Indeed, *Woods* supports our determination that the garage at issue in this case is part of an inhabited dwelling house.

In *Woods*, the defendant argued that "the laundry room is not 'an integral part' of any of the *individual dwelling units* in the complex and thus is itself not an inhabited dwelling." (*Woods, supra*, 65 Cal.App.4th at p. 349,

---

[6]    The manager did not testify whether the furniture belonged to residents or the facility, but the jury could reasonably infer that the furniture was *used* by residents.

[7]    The manager testified that "some employees" parked in the garage.

italics added.) The *Woods* court *rejected* this argument, reasoning that "the relationship of the laundry room to the *complex itself* is the proper focus of inquiry," and concluded that "[b]ased on the evidence of the physical placement of the laundry room within the complex and the fact it was used by tenants to do their laundry, a household chore, we find no error in the court's implied finding this room was an integral part of the complex, and thus an inhabited dwelling." (*Ibid.*, italics added.) Similarly, in this case, the physical location of the parking garage, combined with evidence that some residents and staff parked their cars in the garage supports the conclusion that the garage is an integral part of St. Paul's.

The *Woods* court also rejected the defendant's argument that the " 'philosophical rationale' " behind the first-degree burglary statutes (*Woods, supra,* 65 Cal.App.4th at p. 350)—i.e. heightened protection for inhabited dwellings related to safety and privacy—did not support affirming his conviction. The *Woods* court reasoned:

> "We cannot agree with Woods that the policy interests underlying the offense of residential burglary . . . are not implicated by his crime. As we explained, the residents of the apartment complex at issue could reasonably expect to be safe from unauthorized intrusion in the laundry room. Though tenants may not have 'stored' personal belongings in the laundry room, clothes being washed in the machines would certainly be personal property at risk in a burglary of the room. We conclude the safety and privacy expectations surrounding an inhabited dwelling house are present in the common area laundry room of the apartment complex Woods burgled here." (*Ibid.*)

Similarly, in this case, residents of St. Paul's could reasonably expect to be safe in their parking garage from unauthorized intrusion that might endanger themselves and their vehicles.

9

We are not persuaded by Griffin's efforts to argue that the *maintenance room* was not an integral part of the building's living quarters because no evidence was presented about the residents' use of the *maintenance room*. The People presented evidence from which the jury could have found that Griffin entered St. Paul's *garage* with the intent to steal, and, for the reasons discussed above, we conclude that the garage was part of an inhabited dwelling house for purposes of the burglary statutes. (*Thorn, supra,* 176 Cal.App.4th at p. 262.) Thus, whether the maintenance room was used by the residents is irrelevant.

Accordingly, we conclude that there is substantial evidence to support the jury's true finding that Griffin committed a burglary of an inhabited dwelling house within the meaning of section 460, subdivision (a).

B. *The trial court did not abuse its discretion in declining to strike Griffin's strike prior and in sentencing him to the middle term for his burglary conviction*

Griffin claims that the trial court abused its discretion in declining to strike his strike prior and in sentencing him to the middle term for his burglary conviction.

1. *Governing law and standard of review*

In deciding whether to dismiss a prior strike conviction allegation, the trial court "must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, [he] may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

10

A trial court's ruling on a motion to dismiss a prior strike conviction is entitled to deference and the party challenging such a ruling has the burden to "clearly show" that the ruling was irrational or arbitrary. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978.)

Pursuant to section 1170, subdivision (b),[8] a trial court has discretion to "choose an aggravated, middle, or lower determinate term based on its consideration of mitigating and aggravating factors. [Citations.]" (*People v. Estrada* (2020) 58 Cal.App.5th 839, 843.) We review such choice for an abuse of discretion. (See *People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

---

[8]    Section 1170, subdivision (b) provides:

> "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. At least four days prior to the time set for imposition of judgment, either party or the victim, or the family of the victim if the victim is deceased, may submit a statement in aggravation or mitigation. In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law. A term of imprisonment shall not be specified if imposition of sentence is suspended."

11

## 2. *Factual and procedural background*

### a. *The probation report*

The probation officer filed a report that detailed Griffin's lengthy criminal history, including a 2005 conviction for battery with serious bodily injury (§ 243, subd. (d)) with use of a deadly weapon and the infliction of great bodily injury—the strike prior. The probation report described the strike prior as stemming from an incident during which Griffin threw a large glass tumbler at a bouncer outside of a bar, causing severe lacerations to the victim's neck. The report also indicated that, in 2009, the conviction was expunged pursuant to section 1203.4.[9]

In addition to the strike prior, Griffin's has suffered numerous other convictions and juvenile adjudications. As a juvenile, Griffin suffered adjudications for battery, first degree burglary, and battery with serious bodily injury. As an adult, Griffin was convicted of the following offenses: in 2000, vandalism and resisting an officer; in June 2001, driving with a blood alcohol content of greater than .08 percent; in July 2001, resisting an officer; in September 2001, presenting false identification to an officer; in October 2001, battery of a spouse or cohabitant; in 2002, driving with a license suspended for DUI; in 2003, petty theft; in 2004, battery with serious bodily injury; in October 2005, battery and, while out on bail, infliction of corporal injury on a spouse or cohabitant; in 2011, vandalism; in July 2015, fighting or challenging another person to fight in a public place; in October 2015, insurance fraud; and in 2018, resisting an officer.

---

[9] As noted in part I, *ante*, the conviction remained a strike pursuant to the Three Strikes law.

### b. *The People's sentencing memorandum*

The People filed a sentencing memorandum in which they requested that the trial court impose a sentence of 14 years in prison, consisting of the six-year upper term doubled, together with the imposition of the two year out-on-bail enhancement. The People noted that Griffin had a "lengthy criminal history," including cases in which he engaged in violent conduct. The People also argued that the court should not dismiss Griffin's prior strike given his serious criminal record and that the circumstances of the present offense involved the burglary of a senior living facility. The People also argued that the case presented several aggravating circumstances, including that some of the victims of the current offense, the elderly residents of St. Paul's, were particularly vulnerable and that Griffin had engaged in violent behavior in the past.

### c. *The defense's* Romero *motion and statement in mitigation*

Griffin filed a motion pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) requesting that the court dismiss his prior strike conviction. Griffin argued that punishment under the Three Strikes law would be disproportionate to the severity of the current offense and that the strike was remote in time. Griffin also argued that his prior criminal record was related to abuse that he had suffered as a child, drug addiction, and mental illness. Griffin also maintained that he had demonstrated his ability to remain law abiding for long periods of time and that he had demonstrated a willingness to try to rehabilitate himself. Griffin further contended that he was suffering from a mental condition that reduced his culpability for the crime, he had offered to make restitution to the victims of the current offense, he took only a small amount of property, and he expressed remorse for his conduct.

13

In his statement in mitigation, Griffin requested that the trial court place him on formal probation. In addition to incorporating many of the arguments that he made in his *Romero* motion, Griffin emphasized that the current offense did not involve a traditional residential burglary in that he did not place the elderly residents of the St Paul's facility in "direct harm," and the manner by which he carried out the offense displayed a lack of criminal sophistication.

The defense supported its statement in mitigation with numerous exhibits including a psychological evaluation, an e-mail from a substance abuse counselor suggesting Griffin's amenability to treatment, news articles concerning Griffin's adoption as an adult by his prior foster mother, various letters of support from friends, and a letter from Griffin.

> d. *The trial court's ruling on the* Romero *motion and imposition of sentence*

At the sentencing hearing, the trial court indicated that it intended to impose a ten-year prison sentence. The court reasoned in part:

> "It's not a long-term case. It could theoretically be the upper term case. The reason why it wouldn't go upper term is because I'm giving some -- some minimal consideration for his past.
>
> "But I'll just tell you, Mr. [defense counsel], when I look at the whole record for your client —
>
> "And that's looking at you, Mr. Griffin.
>
> "You've been prolific, and you've been very, very violent, and you've had a lot of people — especially the person who hunted you down, found you, and adopted you as an adult. There were people that loved you, but you have been — it seems to the Court that you manipulate things.

14

"You've had prior residential burglaries. You've had violence, your DV, you drag woman [*sic*] by the hair. You beat men in the face. You've — you really have no excuse considering the abilities that you have exhibited to make money. You're charming. You're not dumb, but you've chosen this other way to go and some of it can be excused by your horrible upbringing but most of it cannot because you just keep reoffending and reoffending. The drugs exacerbate it, but you got on that stand and acted like you really thought that was St. Vincent De Paul. It doesn't -- it didn't sound right to me. It seemed like what you were really doing was trying to figure out if you could get any further than the garage.

"If — as soon as you pulled up in front of that room . . . you saw it was a work room. You left there, and then you kept going around. I think you were looking for doors. Thank goodness you couldn't get in any door because this is [a] vulnerable population. Some people have Alzheimer[']s. They have the doors on the locks so they can't get out because they might go out and get hurt, but it was not a good thing that you went in there. I can't believe that you didn't realize that immediately and leave.

"You wound up taking some things that really meant something to other people that couldn't mean very much to you, but it's a place. It's a residence. It's not your first residential burglary."

The court implicitly denied the *Romero* motion and sentenced Griffin to a total of ten years in prison, consisting of the middle term of four years on the burglary conviction, doubled due to the strike prior, and two additional years for the on-bail enhancement (§ 12022.1, subd. (b)).

3. *Application*

First, Griffin's lengthy criminal history supports the trial court's decision not to dismiss Griffin's prior strike. While Griffin's brief correctly points out that his strike prior is remote and the underlying conviction had

15

been expunged,[10] the strike was premised on violent conduct, and Griffin suffered numerous other convictions that involved violence. As Griffin acknowledges, he "has a prior history of batteries and assaults." While Griffin also points out that he has performed successfully on probation in the past, the probation report notes that he has been placed on probation 13 times prior to his commission of the current offenses. Thus, Griffin clearly had not fully reformed himself, notwithstanding many attempts. In short, in light of his criminal record, the trial court could have reasonably determined that Griffin is a recidivist criminal whose record places him within the spirit of the Three Strikes law. (See *People v. Strong* (2001) 87 Cal.App.4th 328, 338 ["Following *Williams, supra*, 17 Cal.4th 148, the overwhelming majority of California appellate courts have reversed the dismissal of, or affirmed the refusal to dismiss, a strike of those defendants with a long and continuous criminal career"].)[11]

With respect to the trial court's decision to impose the midterm, Griffin argues that there "were no aggravating factors," related to the circumstances

---

[10] Griffin acknowledges that the prior conviction "could still be used as a strike for the purposes of his sentencing in this case."

[11] Griffin notes that, at the sentencing hearing, while the trial court stated at one point that Griffin had "prior residential burglar*ies*," (italics added) in fact he has suffered a *single* prior burglary adjudication, while a juvenile. Even assuming that Griffin has not forfeited his claim of error based on this statement, the trial court's statement clearly does not constitute reversible error. There is no reasonable probability that the court would have imposed a different sentence if the court had been aware that Griffin had suffered only a single prior juvenile burglary adjudication, given the remainder of his criminal record. (See *People v. Osband* (1996) 13 Cal.4th 622, 730 [stating that it was "difficult to discern from the record" whether trial court relied on improper factor in sentencing defendant but concluding that "even if error occurred, there is no reasonable probability that a more favorable sentence would have been imposed in the absence of the error"].)

16

of the current offense. We disagree. While Griffin is correct that he did not threaten violence, or take the property of an elderly resident, the trial court reasonably determined that the vulnerable residents of the senior living facility were put at risk by his conduct. (See Cal. Rules of Court, rule 4.421 [listing circumstances in aggravation, including "(3) The victim was particularly vulnerable"].) Further, Griffin's lengthy and, at times, violent criminal record, clearly supports the imposition of the middle term. (See *id.*, subd. (b)(1), (2) [listing circumstances in aggravation, including "The defendant has engaged in violent conduct that indicates a serious danger to society," and (b)(2) "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous"].) While Griffin's prior history of abuse and mental illness are mitigating, given his criminal history as well as the circumstances of the present offense, the trial court did not abuse its discretion in imposing the middle term.

## IV.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

IRION, J.

17